**Harry M. RUNKLE**

v.

**Joseph D. BIRKMEYER, John L. McCarty, H. J. Bice, Hugo H. Loewenstern and Paula Hassenpflug.**

No. 2598.

United States District Court
N. D. Texas,
Amarillo Division.

Aug. 20, 1959.

New Trial Granted Nov. 5, 1959.
See 177 F.Supp. 877.

John L. Smith and Mark S. Smith, Lubbock, Tex., for plaintiff.

McCarthy, Rose & Haynes, Amarillo, Tex., and Adkins, Folley, McConnell & Hankins, Amarillo, Tex., for J. D. Birkmeyer.

Simpson, Clayton & Fullingim, Amarillo, Tex., for John L. McCarty.

Gibson, Ochsner, Harlan, Kinney & Morris, Amarillo, Tex., for Hugo H. Loewenstern.

E. Byron Singleton, Amarillo, Tex., for H. J. Bice and Paula Hassenpflug.

BENJAMIN C. DAWKINS, Sr., District Judge.

The circumstances out of which this litigation arose began with an exchange of letters between plaintiff and one H. J. Bice, a real estate dealer residing in Amarillo, Texas. They had known each other for about five years, and from the first letter by Bice to Runkle at his home in Columbus, Ohio, the latter apparently had informed Bice that he owned a tract of land near Harrison, Arkansas, with improvements on it, which was for sale or exchange.[1]

Attached was a four page " * * * brief outline of the history of Estate Life Insurance Company of Amarillo, Texas." Runkle had practiced law for several years, but for some time had been engaged in looking after his business interest, including this Arkansas property known as Western Runmoor Properties, Inc., and on receipt of Bice's letter, with enclosure, called that gentleman on the telephone. Bice then informed John L. McCarty, President of Estate Life Insurance Company, of Amarillo, that Runkle was interested in the stock of the Estate Life Insurance Company and McCarty, under date of September 17, 1957, wrote Runkle as per plaintiff's Exhibit No. 3;[2] also enclosing several documents, with headings or brief descriptions, including one headed "Appreciation of value versus Immediate Profits", reciting purported facts and figures showing the phenomenal success of many life insurance companies throughout the United States.

The approximate month between the dates of letters by Bice and McCarty to Runkle was explained by Runkle as due to the fact he was in Europe and the matter did not come to his attention for some weeks. He made no record of dates, but his recollection was that he came to Amarillo about the last week of September or first part of October. Bice escorted Runkle from the hotel in Amarillo to the office of Estate Life Insurance Company, where he met McCarty and others, including J. D. Birkmeyer, now one of the defendants in this suit.

Runkle's story of what took place, related as a witness, much abbreviated, was that McCarty reviewed the affairs of both the Estate Insurance Company and another corporation, the Estate Development Company, apparently an affiliate, at length, calling upon Birkmeyer to verify many of his statements. Afterwards, Runkle was shown the physical properties, and wound up "completely sold", as he expressed it, on the proposition. He testified an agreement was verbally reached by which he was to exchange his stock in the Western Runmoor Properties and its assets, with deed to the real estate, for 50,000 shares each in Estate Life Insurance Company and Estate Development Company; and that he then inquired as to what State agencies and their locations he could apply to verify the representations of McCarty and his

1. "Dear Mr. Runkle: (August 19, 1957)
   "Was at your ranch last week and it looks as if I have a chance to make a deal. This is the only one I thought anything of that I would submit to you.
   "These stocks are basically good and for the future I think they have the right people behind it. You can look this over and call me at DR 2-2228 in Amarillo and I will meet you at the air port if you are interested and show you all the property and I think this will be a good deal.
   "Thank you very much and I hope to see you soon."

2. "Dear Mr. Runkle: (September 17, 1957)
   "At the request of Mr. H. J. Bice I am sending you herewith a financial statement, a history of our life company and other background material in connection with your possible interest in our company. The statement as of January 1 is for comparison purposes only and does not give a clear idea of our present status. Since this time we have added the business of Physicians Life and Accident Company and have increased our reserves to take care of it.
   "I would like very much to invite you to Amarillo to look over our property. We need the cooperation of men of your type to realize our fullest potentialities. Is it possible for you to visit us?"

associates, but the latter seemed offended that one of his high standing and responsibility (many assertions of his business connections and political past having been summarized) should be doubted. Hence, the inquiry or investigation presumably was not made, and he, Runkle, returned to his home in Columbus, Ohio, feeling that nothing remained but the execution of the formal documents.

On taking the stand in this trial, Runkle described at length what was said and done by McCarty and Birkmeyer to impress him with their importance and integrity, including exhibition of fraternal emblems, listing political affiliations, etc. He was then asked:

"Q. Now, 'Runmoor is what? Tell the Court.' A. Runmoor is a company which owned all of my properties in Arkansas. It was a company that was called 'Runmoor Western Properties' I believe." (R. Vol. I, P–24.)

After answering this and other questions, he again went into representations of and discussions with McCarty for some nine pages when his counsel interrupted and remarked:

"Q. All right. You started a while ago to tell the Court about Runmoor Properties, Inc. A. Runmoor Properties, Inc. owned, oh, in the neighborhood of 4200 to 4500 acres of land which I had acquired and built up over many years, in the Northwestern part of Arkansas. The first part of the acquisition of it started way back when my father, my wife's father and my own father —in those days Eureka Springs used to be the Hot Springs or whatnot of the place, where steel men and other people went for the winter, and my people went there and they became—they were steel men, and they became interested in the country and bought various tracts here, there and wherenot, which they built into what is called the 'Rising Sun'—at that time, the Rising Sun.

"I bought and inherited this from them on their deaths and when the first World War started, I went down there to a little place called Hollister and there I met some officials of the International Shoe Company, who took me to see some mountain school, and so on, that was there, and I became very interested in those mountain people.

"So, from time to time, I went down there and eventually I began to block up and get interested in the plight of these people. At that time there were no roads hardly back and forth and I took, oh, the best part of two or three years blocking up these three large ranches, one of which was called the Eastern, or Western— the ranches went under the name of R–Bar, and the ranch, the Western Ranch was a little over 2,000 acres. It went to the Missouri line where a friend of mine owned 3,000 acres on the other side of the line. So there was a blocked up 5,000 acres, the largest in that part of the country at that place." (R. P–26.)

These recitals also continued for many pages, and were followed by introduction of his Exhibits 15–19, which included pictures and other documents describing and advertising Runmoor Properties; and when this was finished his counsel launched into subsequent events that led to the ultimate closing of the deal, asking:

"Q. 'Very well now, you have given the court a picture of Runmoor Lodge and adjacent properties and you had gotten down to your final conference in Amarillo with Mr. McCarty and Mr. Birkmeyer. Now what transpired after that?" (Page 42 et seq. of Record.)

Runkle testified that some days after returning to his home in Columbus, Ohio, Bice called him, Runkle, on the telephone and stated he and Birkmeyer "were over examining the Ranch" (meaning Runmoor Properties). This call was from Harrison, Arkansas, county seat near The Ranch. Bice reported to Runkle Birkmeyer had examined the property and "was delighted with the whole thing." Both were on the telephone, with separate receivers; Runkle and Birk-

meyer discussed the price of Runmoor ($500,000) which "Birkmeyer thought was a little over-priced", but emphatically stated his purpose in buying was for his own occupancy. At this stage in his testimony Runkle did not quote himself as saying anything about the deal supposedly agreed upon at the meeting in Amarillo, or why Birkmeyer had become the sole prospective purchaser. However, he quoted himself as asking over the telephone: "How sure are you of the evaluation of $4.00 a share of your stock out there", and Birkmeyer replied he "would stake his life on it." He then inquired if Birkmeyer "intended to move with his wife to Runmoor * * * and carry on that business", and the reply was "he certainly did."

"Q. 'The Court.' In each instance tell who he understood he was talking to. A. 'I was talking to Mr. Birkmeyer and Mr. Bice and their voices * * *'."

Runkle further quoted himself and Birkmeyer as follows:

"Well, I said, 'Would you be satisfied then if I told you I would be willing to accept 400,000 shares—' no, what is it? '100,000 shares of stock, if you will give your absolute assurance, you and Mr. Bice, that there is a market at $4 and more a share that can be had for this stock over a period of years?' And he certainly said there was and he was delighted—with my generosity and effort to be kind to him and lowered the thing down 400,000 shares, or whatever it was—100,000'." (R. P–44.)

But again he said nothing about the Amarillo agreement, nor did he express surprise that Birkmeyer alone was the negotiator. However, his counsel, apparently sensing the effect, asked:

"Q. Mr. Runkle, are you sure now that that's the conversation

from Harrison? Isn't it a fact in your first conversation from Harrison that you were rather surprised that Mr. Birkmeyer had entered that picture? A. That's right. I couldn't find out then just *why this thing was turning over to an Estate Life proposition and what was happening about the way it was left when I left Amarillo.* But these two gentlemen, at the conversation, assured me—

"Q. Identify who assured you. A. I am talking about Birkmeyer and Bice. Assured me that they knew what they were talking about and that the deal was a better deal, to me, as an all-Estate Life stock deal than the combination deal that had been discussed with me when I was out here. And they assured me that the Estate stock have a better history and better marketability and a better future over the years than the combination thing that had been represented to me.

"I knew nothing about who owned what, and my proposition was simply one of 100,000 shares, they were to deliver to me, with an assured understanding that the stock had a future and a present marketable value at that time of from four to more.

"They represented that if I hung on to it for ten years, they were sure that the stock had a history that would bring it into $8 or $10 a share." (R. P–46.)

Notwithstanding, he returned to the events and meetings with Birkmeyer until his counsel inquired:

"Q. Very well. Now did you have a later conference in Kansas City? A. Yes. Shortly after this conversation that I have related to you, a letter was sent to me by Mr. Birkmeyer, I believe it was.[3] (R. P–46)

3. "October 12, 1957
"Dear Sir:
"Pursuant to our last telephone conversation, I proceeded to Amarillo to obtain and compile additional information

regarding the status of Estate Life Insurance Company.
"Regrettably, a complete and up-to-date audit of the company's books has not been prepared recently and as such an

**214**

This letter was filed in evidence as Plaintiff's Exhibit No. 21 on Page 46 of the Record.

There are many things otherwise, among the chief litigants in this case, which tend to show bad judgment, to say

audit is impossible to effect at this time, due to the recent acquisition of the Physicians Life business, I am forwarding herewith, a mimeographed copy of the latest trial balance.

"I have remained here the last three days to obtain as much information as possible, and this being Saturday, I am typing this letter and ask that you overlook any mistakes in typing.

"Information which I have added to the trial balance is of necessity both estimated and general, but I consider it accurate enough for our mutual knowledge.

"As I have previously stated Sir, the method used in reporting the assets and liabilities of a Life Insurance Company is rather foreign to that of the ordinary 'commercial' enterprise.

"This difference is primarily evident in the items of admitted assets and of evaluating as an asset, our stock on hand of 'Insurance in Force.'

"In other words, a case of tomatoes on the merchant's shelf is admittedly an asset offsetting the reduction of capital by the amount of the cost. The cost of our 'case of tomatoes' as represented by Insurance in Force shows no admitted asset value, the only evidence shown on our statement being the reserve set against this risk, which is shown as a liability.

"The 'book-value' would be properly determined by dividing the total shares outstanding into the total of capital and surplus (in our case at the present time, less than $400,000.00). In view of the foregoing example, such a method would be fallacious and far afield from the actual or market value of the stock.

"A full discussion of these facts would be impractical within the pages of this letter but will require a personal discussion at a place convenient to you and at a time when you felt up to listening to my long and perhaps tedious discussion of the Life Insurance business. *Contingent upon your continued interest in pursuing this proposed trade.*

"From a normal point of view, the condition of the Estate Life is actually rather satisfactory especially comparatively with contemporary companies. However, Mr. McCarty and I are far from satisfied. In fact we feel the condition is 'critical' but not from the view of failure. But rather, from the fact that our good fortune and success in the production of business has created a problem in our surplus rather difficult for us to face.

"Our capital structure has been strong and adequate and probably a little ahead of comparable companies. However, we have had such an influx of new business, that we have of necessity *depleted our surplus* to where we are faced with the unpleasant prospect of reducing our production force. This is *more serious than appears* because it is a long hard and expensive process to build or rebuild agencies capable of producing a profitable volume of business.

"We are using all our resources and experience to the best of our ability to solve this problem. You can understand our reluctance to relinquish any portion of this valuable asset. Paradoxically, we are penalized by our progress.

"Our ability to alleviate this condition *remains to* be seen, but we attack it with confidence.

"Should we not succeed does not necessarily indicate failure, but only a curtailment of our production until we catch up with ourselves — the nature of the business making his procedure possible.

"I am sorry that I cannot furnish you with a complete and detailed report of recent date but this would be impossible at this time. We are doubly 'swamped' because of our recent acquisition of business, and at best it would take from three to four weeks to prepare a complete statement.

"After studying this rather incomplete report, if you are still interested in completing this trade as tentatively agreed on by telephone, or if you wish to discuss it further, I will be delighted to meet with you at some intermediate point, or if you prefer to remain at home, I will meet with you in Columbus.

"In our telephone conversation, I did not mention the condition of the Lodge and adjoining buildings and roads. I was somewhat disappointed in the condition of these things, and especially the plumbing. The roads need blading and the one to the boat dock is hardly usable in its present unfinished condition. The lake is considerably lower (at a normal level however) and access to the boathouse is most difficult.

"The bannisters on the cabins are rotted and need replacing and I believe a lot of work needs to be done on the plumbing before reopening next Spring. I mention these things only because I know

the least, with some of them smacking of exaggeration of such transparency that it would seem experienced business men, as all parties purported to be, would have found it hard to "swallow." For illustration, take the documents sent to Runkle by both Bice and McCarty with their letters: Those attached to Bice's letter of August 19, 1957, evidently furnished by McCarty or Estate Life Insurance Company, recited the charter of the latter had been approved by the State authorities on *March 26, 1953*, with an authorized "capital of $25,000.00 divided into 2,500 shares, with a par value of $10.00 a share."

One year later "in March 1954", the charter was amended "to permit increasing the capital stock to an amount not to exceed $100,000.00", with shares "authorized to have a par value of $10.00", approved also by the State authorities.

On November 15th of the same year, a "second charter Amendment" stated *"the total outstanding 10,000 shares * * * voted to authorize the company's directorate to amend the charter * * * increasing the capital from $100,000.00 to $500,000.00" (four fold) "to be divided into 100,000 shares without nominal or par value * * * every share was made equal in all respects. Moreover two shares of stock were issued for each share of stock that had been issued after the original charter or any amendment thereto"*, and there followed again the statement: *"This Amendment bears the approval of the Attorney General and the file mark of the Insurance Department as of December 21, 1954."*

On March 8, 1955, the stockholders voted a Third Amendment, in which "the directors were authorized to amend the company's charter * * *" by which "the company's capital stock of $530,-000.00 (where the extra $30,000.00 came from does not appear) *would be divided into 500,000 shares of stock without nominal or par value"*, every share of which was to be "equal in all respect to every other share, and, further to issue four shares of such stock for every share issued under the original charter or any amendments thereto." This "Third Amendment", *within two years,* was also said to have had the approval of and was filed by the same State officers on May 17 and 18, 1955.

Then on March 15, 1956, at the annual meeting, in a *Fourth Amendment* of the charter "the stockholders * * * approved a *division of all outstanding shares of stock, resulting in five shares of stock issued for every share issued under the original charter or any Amendment thereto."* This action, it was stated, had also been approved "by the Attorney General" and *"filed by the State Insurance Department as of November 28, 1956."*

Under the Fourth Amendment heading, this was added:

"In just one year after its organization Estate Life had become a full capital stock company with $250,-

that you are not aware of them because you have been unable to visit there very recently, and to point out that immediate (practical) possession is indicated in order to accomplish as much repairs and shaping-up as possible during the more dormant season.

"I will await your phone call to me at Peyton, Colorado, Ph. 112.

"Should you be unable to reconcile to this trade, it has been my very good pleasure to have visited with you even for the short time. I wish I could have had that pleasure much sooner.

"Mr. McCarty had many teeth extracted yesterday, then made a speech at a banquet last night. Needless to say, he is rather puny today and has remained home to rest. *He asked me specifically*

*to send his very best regards and his regrets that sudden developments prevented him from continuing that which was started.*

"Mr. Bice has called me daily, so rest assured he is staying on the job, if a little anxiously.

"The weather here is extremely overcast and rather moist today. It has the appearance of approaching snow. However, as you well remember from your Borger days, its mood changes every few hours. Bright sunshine tomorrow would not be phenomenal.

"Praying that this letter will find you returned to your usual vigor and well-being, I remain,

"Your very truly,
"J. D. Birkmeyer."

000.00 capital and an equal sum in surplus. It recorded its first $1,-000,000.00 insurance in force in the first 6 months of its existence. In its second year, Estate Life had more than $3,000,000.00 of insurance in force."

It can thus readily be seen that by far, the major number of shares were added by "splitting" those previously issued, presumably without putting anything additional into the Treasury or the assets of the corporation. It would seem, therefore, to require a very credulous person to believe such rapid growth could have been experienced to justify the issuing of 11 additional shares for every one that had presumably been paid for.

The documents attached to or enclosed with McCarty's letter of September 17, 1957, were equally and obviously exaggerated. Both his letter and Bice's, with enclosures, came into the hands of Runkle before any negotiations began.

There was testimony also that Runkle had offered the Runmoor Properties, prior to this time, for about one-tenth of the half million dollars which he claimed it was worth when traded for the Estate Life Insurance Company's 100,000 shares of stock.

The record also shows that he, McCarty, had learned, even before Runkle was induced to come to Amarillo, that no assets would be included in the taking over of liability to the policyholders of Physicians Insurance Company, as he represented it, of some $17,000,000, but as stated in an audit by a State examiner, to be about $8,000,000. In a desperate effort to get some assets from this or some other company which had gone into the hands of the State liquidating agency, McCarty admitted later he had given one of its employees a "present" of $2,-000, for "past favors" and others expected in the future, which, when discovered, resulted in the discharge of the agent or employee, and McCarty's removal as President of Estate Life Insurance Company.

However, in spite of Birkmeyer's letter of October 12th, calling the condition of the Estate Life Insurance Company "critical", but expressing confidence in its ability to survive (which was to be expected of one whose own investment was at stake), Runkle closed the trade on November 2, 1957, with Birkmeyer for the Estate Life Insurance Company stock alone.

Birkmeyer, instead of moving into the Lodge and taking over personally management of the Runmoor Properties, as he had assured Runkle he would do, promptly began efforts to dispose of it. In less than three months, this brought him into contact with a former waitress, by the name of Paula Hassenpflug, who in a short while, according to her own testimony and other evidence, had blossomed into a very successful operator in real estate for her own account, in New Mexico, and also perhaps in Arizona. The Supreme Court of New Mexico accused her of bad faith and gross misrepresentation in another case which it decided against her.

In the meantime, Birkmeyer apparently got into financial difficulties, and, if his own testimony is carefully considered, he allowed this woman to "pull the wool over his own eyes" by going through with a trade of the Runmoor Properties for a mortgage on lands in New Mexico, which mortgage was already incumbered with a prior lien (the total amount of the mortgage being $210,000, or as against Runkle's value of Runmoor of $400,000 to $500,000) notwithstanding he had learned of this fact before closing the trade, just as Runkle had been informed in Birkmeyer's letter of October 12th of the "critical" condition of Estate Life Insurance Company.

It is even more difficult to understand why, on receipt of Birkmeyer's letter of October 12th, quoted in footnote No. 3, Runkle did not, before closing the deal, insist upon some independent examination of Estate Life Insurance Company's affairs. However, it is apparent that he was anxious to dispose of his own property, and in view of the assurances contained in that letter, decided to go ahead with it. Had this investigation been de-

nied him, he, of course, could have called the matter off.

On the other hand, if the comptroller of Estate Life Insurance Company, Elbert V. O'Neal (Vol. II, Pages 603–609 of Record), is believed and no reason is seen why it should not be, both McCarty and Birkmeyer knew the company was insolvent some time in August or September more than a month before the stock of Runmoor Properties was exchanged for $100,000 shares of Estate Life Insurance Company stock. They also knew revenues from premiums on insurance policies were not sufficient to pay operating expenses, including salaries of employees. In spite of this, McCarty furnished the major portion of the Estate Life Insurance Company stock traded to Runkle out of that which he had contracted to purchase from Birkmeyer, and thereby relieved himself from further payments. The record indicates this stock stood in his name and that he assigned it directly to Runkle.

The comptroller's testimony shows that this insolvency resulted from a reappraisal of some 83 acres of land, in which value was reduced from $8,000 to $5,000 an acre, plus failure to receive any assets along with the acquisition of policyholders' contracts taken over from Physicians Insurance Company then in liquidation by the State Insurance Commission.

Runkle sued originally to set aside the exchange with Birkmeyer of the stock of Runmoor Properties for 100,000 shares of stock in Estate Life Insurance Company on the ground of alleged fraud committed by McCarty, Birkmeyer and Bice, with damages both actual and exemplary. But, it is now stated in his brief, that plaintiff seeks damages only, of the two types stated, instead. By amendment, he impleaded Hassenpflug, charging, in effect, the quick sale to her by Birkmeyer was a conspiracy to place Runmoor Properties beyond plaintiff's reach, to which she was a party, and that Birkmeyer knew the condition of the Estate Life Insurance Company, and never had any intention of occupying the Ranch

with his family. However, the latter calls attention to the fact that, since Hassenpflug was brought into the case by Runkle, he, Birkmeyer, is suing her as a third party defendant here, to annul the exchange of Runmoor Properties for the mortgage on New Mexico lands. He also charges fraud by Hassenpflug in representing that it, the mortgage, was free of incumbrance. Birkmeyer's argument is that if successful, this would put the Arkansas Ranch back in his name to respond to any judgment which Runkle might recover against him, thus destroying any beneficial effect to him of the alleged conspiracy or "covering up" might have had. The mortgage for which the ranch was traded and which the evidence shows was already incumbered by a prior lien or claim was, within a few months, it is stated and also not denied, foreclosed, without anything left for Birkmeyer, and it is also stated in opposing briefs, without denial, though perhaps not shown in the record that he, Birkmeyer, took no appeal, and now relies exclusively upon his demand to annul his trade with Hassenpflug.

A careful examination and weighing of Birkmeyer's own testimony, it is believed, will show he had knowledge of the prior lien upon this mortgage and that it had not been discharged before closing the trade with Hassenpflug.

O'Neal the former comptroller of Estate Life Insurance Company, as a witness for plaintiff, testified that when he returned from an encampment of the National Guard, in which he was a Captain, that began early in July 1957, he "familarized himself * * * with the financial status at that time of Estate Life Insurance Company, and found several indications that the company was in bad financial condition, and, that with the difference of $3,000.00 an acre in the value of the land would reduce its value by some three hundred thousand dollars in the admitted assets " * * * and * * * it was my opinion * * * that the capital was impaired."

"Q. How much impaired? A. In excess of a hundred per cent."

He was then asked:

"Q. Did you acquaint that fact, Mr. O'Neal, to Mr. McCarty? A. Yes, Sir.

"Q. The President? A. Yes, Sir, I did.

"Q. Did you acquaint it to Mr. Birkmeyer? A. Yes, Sir, I did.

"Q. Now was this prior to November 1, 1957? A. Yes, Sir, it was.

"Q. * * * when did you terminate your services with the Company? A. On November 1, 1958—57."

He was then asked if he had apprised both McCarty and Birkmeyer "that the capital stock * * * in your opinion was more than 100 per cent impaired?" and he replied:

"A. Yes, Sir, providing that is correct.

"Q. What was the reaction of these men to your information? A. Well, they were quite concerned." (R. Pgs. 603–609.)

O'Neal further testified when he returned from camp, he knew the company was incurring an operating loss. This was shown by the fact that "* * * our payroll exceeded our premium income * * *", which "latter was the major source of revenue." He finally stated with respect to the date, when he discovered this "* * * I think about the time the first payroll was due, which was around the first of August, something like that."

It may reasonably be concluded, I think, that these findings and reports to McCarty and Birkmeyer, which were never disputed, account for the former's withdrawal from the trade of stocks with Runkle insofar as acquiring any interest, at least on the face of the matter, in Runmoor Properties was concerned and, perhaps also, for his furnishing the major portion of the Estate Life Insurance Company stock, out of the "Escrow" file for delivery to Runkle. This was done by his endorsement and on which a substantial transfer tax was never paid.

Query: Did this failure to pay the tax make the transfer illegal under State law? If so, the State perhaps had the right to complain.

It may also be inquired whether, in view of the glowing picture that was painted of the great success and rapid growth of Estate Life Insurance Company, in the documents sent with Bice's letter of August 19th (which as previously stated undoubtedly came from that company's files, with the knowledge of McCarty), and similar ones sent by McCarty, himself, with his own letter of September 17th, made the latter, both morally and legally, as President of the company, guilty of a fraud in not apprising Runkle of the situation as he had learned it before the deal was closed.

Knowing this condition as he undoubtedly did, his participating with Birkmeyer in foisting upon Runkle stock, which at that time was apparently worthless, even though he acquired no actual interest in the Runmoor Properties, it would seem, made him liable for the consequences. Besides, he relieved himself of a large block of the stock, on which, as stated above, he had made two annual payments of $10,000 each. If the deal with Birkmeyer for this "Escrow" stock was made before the affairs of Estate Life Insurance Company became "critical", the subsequent developments would not have relieved McCarty from carrying out that contract. However, by cooperating with Birkmeyer in his evident desire to acquire the Runmoor Properties, he was relieved of that substantial debt by joint consent.

It has been said in other cases where a trader has been fully informed of the true facts, or such as without hinderance would lead thereto, and he simply fails to avail himself thereof, he has no one to blame but himself, if he makes a bad investment. However, the situation in this instance involved complicated accounting and analysis by experienced auditors, which the State Insurance Commission undertook after the negotiations for the trading of these stocks had commenced, and were not concluded until

some time in December, after the Runkle-Birkmeyer trade had been made November 2, 1957. It is also well to remember that Runkle testified, without serious efforts to dispute him, that McCarty got his feelings hurt when he, Runkle, inquired where he could find the State agent or agencies to check the representations made on the occasion of the first meeting between the parties.

At the same time, Birkmeyer's statements in his letter of October 12th were only half truths, i. e., the company's affairs were "critical" and he added:

"But not from the view of failure, but rather, from the fact that * * * our good fortune and success in the production of business has created a problem in our surplus rather difficult for us to face."

"Our capital structure has been strong and adequate and probably a little ahead of comparable companies. However, we have had such an influx of new business, where we are faced with the unpleasant prospect of reducing our production force. This is more serious than appears because it is a long, hard and expensive process to build or rebuild agencies capable of producing a profitable volume of business."

Can it be imagined that if Birkmeyer or McCarty had told Runkle, as they were told by their comptroller, the capital of the company was "one hundred per cent depleted", the deal would ever have been consummated? I think not.

The result is that, as between Runkle as plaintiff, and McCarty and Birkmeyer, as defendants, Runkle is entitled to recover.

Arts. 4004 and 7047, Vernon's Ann. Civ.Rev.Stats. of Texas: Wood v. Williams, Tex.Civ.App., 46 S.W.2d 332, Crofford v. Bowden, Tex.Civ.App., 311 S.W. 2d 954.

At the same time, as between Birkmeyer and Hassenpflug, the former, after considerable vacillating, the record will show from his testimony, went through with the deal between them,

after he knew the lien on the mortgage he purported to buy, had not been satisfied, but was later foreclosed.

This does not support a demand to annul that agreement, especially in view of Hassenpflug's quick action, which like that of Birkmeyer, has put this property, by separate parcels, in the hands of persons who, so far as known, are innocent and who are not before this Court.

Besides, it is now said Runkle demands damages alone.

The evidence as to the value of Runmoor Properties is not such that a proper judgment can be rendered. Therefore, the issue of amount of damages will require a further trial.